PER CURIAM.
Appellant, the Department of Commerce (Department), hired appellee, Arthur G. Ken-nerly, as a communications officer on September 20, 1976, and Kennerly remained an employee of the Department until dismissed on May 31, 1994. For several years prior to his dismissal, Kennerly worked in the Department’s International Trade and Development Division, and during the time period pertinent to this appeal, Kennerly worked as a development representative II (trade representative) in the Trades Section. Following his dismissal, Kennerly filed an appeal with the Public Employees Relations Commission (PERC) and a formal administrative hearing took place on June 30, 1994. The PERC-designated hearing officer, Jerry Cheatham, issued a recommended order finding that the Department had just cause to discipline Kennerly for below-standard work performance. As found by the hearing officer, “Kennerly did not produce any significant results in the area of his work he had been told was the most important.” The hearing officer also considered the statutory mitigation criteria and recommended mitigation of the termination to a 90-day suspension with no award of attorney’s fees or costs. In recommending mitigation, the hearing officer noted that “Kennerly’s long and good record strongly supports mitigation of his dismissal.”
In its final order, PERC substituted its analysis of the dispositive legal issues and conclusions of law for that of the hearing officer. PERC ordered that Kennerly be reinstated and provided with back pay and benefits as well as attorney’s fees and costs. Because PERC failed to identify sound policy reasons supported by the record in rejecting the hearing officer’s analysis, we reverse and remand.
The performance standards listed on the Employee Performance Appraisal forms used to evaluate Kennerly’s job performance consist of seven criteria including criterion 1, focused on by Kennerly’s supervisors in this case: “Participate in two major overseas trade events which promote Florida’s manufactured goods. The minimum number of participants to be set at 12 catalogue entries. A minimum of at least 6 actual company full participation may reduce the number of cata-logue represented.” * From 1988 until 1992, however, Kennerly spent most of his time on duties other than those described in criterion 1.
In particular, Kennerly coordinated trade/export seminars for Florida businesses, *1367 which included explaining to businesses how to export products. He also responded to inquiries and visitors to the office and worked on multi-state catalogue shows. Work on catalogue shows, which take place in Europe, involves assembling printed materials from businesses and mailing them to the Department’s European offices for inclusion in a show; the Department does not send its Florida employees to catalogue shows.
Other trade representatives with the same job description performed different duties, however. These representatives had assigned targeted industries and organized participation by Florida businesses in foreign trade shows or fairs, as described in criterion 1. A trade show or fair is located in only one city and is sponsored by organizations other than the Department; generally, each show is targeted at one industry or a related group of industries. At least one Department employee works a trade show to assist businesses in making presentations and to substitute for businesses that cannot attend but have sent catalogues.
Kennerly preferred not to travel or work on trade shows. With the knowledge of former Division Director Slattery, Kennerly instead focused on other duties such as multi-state catalogue shows and seminars. When Thomas J. Roesch became Kennedy's immediate supervisor in May 1990, Roesch noticed that Kennerly was not doing trade shows. Roesch asked Slattery about this, and Slat-tery responded that Kennerly was doing other work. Specifically, according to Roesch, Slattery said: “Don’t worry about it. Arthur is not going to do trade shows. Just work around him. Don’t make a big issue out of it.”
In June 1992, the Department hired Susan Idtensohn as the new Division Director. Id-tensohn had substantial private sector experience and took a “proactive” approach to stimulate exports. Early on, she specifically told each trade representative, including Kennerly, to emphasize trade shows and trade fairs. Idtensohn made a management decision that trade shows were more effective stimulants to export sales than catalogue shows. Further, Idtensohn intended to measure success by the number of trade shows, the number of businesses participating, and the amount of business “written” within six months after the show. The entire office knew soon after Idtensohn arrived that she intended to make targeted industries an office priority. By October 1992, each trade representative, including Kennerly, had been assigned a targeted industry or industries and, on January 11, 1993, Idtensohn informed all trade representatives that they needed to identify three trade shows or fairs from the trade calendar of events for which they would recruit Florida business participation.
At the hearing, witnesses indicated that four to six months constituted sufficient lead time for a trade representative to organize participation in a trade show, and the hearing officer determined that “a reasonable lead time for trade show development is around six months.” The hearing officer further determined that by direct communication, performance evaluations, and performance improvement plans, Kennerly was notified that he needed to participate in trade shows to achieve the goals of his position description. Kennerly was also aware of the Department’s target level of participation for any trade show. Specifically, the hearing officer found that “a preponderance of the evidence proves that Kennerly was personally aware that his specific job duties had changed, and that the relative importance of the various components of his job had changed, although what he was doing was still within the scope of his generic position description.” The hearing officer rejected, as unsupported by the evidence, Kennedy’s argument that he was not properly informed that he could be fired for failing to recruit for trade shows. The hearing officer thus concluded that the Department had just cause to discipline Kennerly. After analyzing the statutory mitigation criteria, however, the hearing officer recommended mitigation of the imposed penalty of dismissal to a ninety-day suspension without pay.
*1368 In the final order, PERC determined as a matter of policy that a performance standard or the weight given thereto may not be substantially changed verbally:
The Commission agrees with the Agency that it has the right to determine the weight of any particular performance standard. In fact we have encouraged agencies to do so. We have also stated that an agency may establish a standard whose relative importance is so great that failure to achieve that standard alone, can result in an employee’s overall failure to meet performance standards. As a matter of policy, however, we reject the Agency’s suggestion that a published performance standard or the weight given to a performance standard can be substantially changed verbally.
When an Agency seeks to significantly change a performance standard, as here, to signal to an employee the importance it attaches to both the duties affected and the employee’s achievement of the new standard, the Agency must follow its procedures. If an agency does not have a published procedure, then sound labor policy would require that the change in duties must be in writing and that the employee be given reasonable notice of the change. This policy ensures that employees know what is expected of them by the Agency and how important that performance standard is in relation to the employee’s overall duties.... An agency’s increase in the importance of a performance standard to the extent that its satisfaction becomes the sine qua non of an overall satisfactory evaluation requires written, not verbal, notification to an employee that the standard has been modified.
Based on this policy determination, PERC vacated Kennerly’s dismissal and directed the Department to reinstate him.
We find no support for PERC’s conclusion that when an agency increases the relative importance of a performance standard to such an extent that failure to satisfy that standard will result in dismissal, the agency must notify the employee by providing a specific written modification of a performance standard. As the hearing officer observed, this record demonstrates Kennerly’s knowledge of the trade show requirement:
Kennerly is in what amounts to a sales or public relations position. Working on trade shows was part of the job in 1988, and continued to be part of the job at all times material to this case. The importance of this facet of the job changed after Idtensohn was named Division Director.
However, Kennerly was made aware by November 1993 that criterion 1 regarding trade show participation by his target industries was considered by the Agency to be a critical part of his job, and that failure to achieve standards on that criterion could alone lead to dismissal. See, e.g., Vasquez [Vazquez] v. GFC Builders Corp., 431 So.2d 739 (Fla. 4th DCA 1983) (employer may modify or change an employee’s work assignments so long as the new requirements are reasonable, within the ambit of the position for which the employee was hired, and applied in a non-discriminatory fashion). Further, this information was verbally reiterated to him on numerous occasions.
He stated in his own testimony that Idtensohn personally told him in 1993 to spend the majority of his work time on recruiting and working trade shows. I do not know how much clearer instructions could be from a division director to an employee.
Unemployment appeals decisions, such as the case cited by the hearing officer, instruct that an employer may change the duties of an employee and an employee’s subsequent refusal to perform constitutes misconduct warranting dismissal and justifying denial of unemployment benefits. See, e.g., Maynard v. Florida Unemploy. Appeals Comm’n, 609 So.2d 143, 145 (Fla. 4th DCA 1992) (“The general rule is that changes may be made in the duties of an employee, so long as they are reasonable and are usual for the particular position for which the employee *1369 was hired.”); Kraft, Inc. v. State Unemploy. Appeals Comm’n, 478 So.2d 1183, 1184 (Fla. 2d DCA 1985); Vazquez v. GFC Builders Corp., 431 So.2d 739, 741 (Fla. 4th DCA 1983) (employer can “add to, subtract from, or change an employee’s work assignments” and “this is common and permissible so long as the duties and requirements are reasonable, within the ambit of the position for which the employee is hired, and applied to all employees without discrimination”). As the Kraft court explained, “[a] change in an employee’s work assignment is permissible as long as the duties are ‘reasonable’ and “within the ambit of the position for which the employee is hired_’” 478 So.2d at 1184. We find this reasoning analogous and persuasive, and we hold that an employer may adjust the weight or priority of tasks related to the employee’s job description and may discipline the employee for failure to meet the job requirements as long as the adjustment was reasonable and the employee was adequately notified.
In this case, as the hearing officer noted, the requirement to participate in trade shows fell within Kennerly’s job description. Further, Kennerly knew that he was to focus on trade shows and that his failure to do so could lead to dismissal. Despite this knowledge and several opportunities for improvement, Kennerly repeatedly failed to successfully recruit significant participation for trade shows. Competent substantial evidence supports these findings, and the hearing officer thus properly determined that the Department had just cause to discipline Ken-nerly. Indeed, we hasten to point out that trade shows had always been part of Kennerly’s job as a trade representative. PERC’s overly mechanistic approach would lead to an avalanche of paper in the form of changed job descriptions and changes in emphasis legitimately brought on by management. In the absence of some showing of arbitrariness, we are unwilling to so constrain managers in state agencies.
Additionally, in reversing the hearing officer’s analysis and conclusions of law, PERC determined that the Department failed to follow its own procedures:
Here, the Agency did not follow its published procedures when it changed Ken-nerly’s performance standards. The Agency also used Kennerly’s performance improvement plan to change his first performance standard and then evaluated and disciplined Kennerly under the plan’s standard instead of under his published standard.
Again, we find no support for this conclusion. The Department never changed Kennerly’s job description or performance standards, and Kennerly was evaluated under the same standards, including criterion 1, throughout the pertinent period. Although Kennerly knew in 1990 that Slattery had made an exception for him because of his aversion to travel, Kennerly could have had no reasonable expectation that this exception would be permanent, especially in light of Idtensohn’s repeated directives as well as Roesch’s notes and instructions.
Appellant also asserts that the hearing officer’s mitigation recommendation should be rejected. In its final order, however, PERC did not consider the mitigation recommendation. Accordingly, we remand the case to PERC for a decision on this matter.
REVERSED and REMANDED.
BARFIELD, KAHN and DAVIS, JJ., concur.

 In construing this sentence, the hearing officer stated: "Although ungrammatical, this is a verbatim copy of standard one. However, a preponderance of Ae evidence shows Aat all concerned understood this to mean two shows and 12 entries by catalog or 6 in person sales staff.”